**FOUR "H" CORPORATION, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Court No. 83–11–01641.**

United States Court of International Trade.

June 12, 1985.

Myron Solter, Washington, D.C., for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, and Kevin C. Kennedy, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

*Opinion and Order*

RESTANI, Judge:

Plaintiffs challenge a final negative antidumping decision of the International Trade Administration (ITA) with regard to canned mushrooms imported from the People's Republic of China (PRC) in 1982. 48 Fed.Reg. 45,445 (October 5, 1983). Plaintiffs have filed a motion for judgment on the administrative record under Rule 56.1 of this court in which they challenge the basis chosen by the ITA for determining United States price as defined by section 772 of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1677a (Supp. IV 1980).[1] The parties agree that under the statute, "purchase price," rather than "exporter's sales price," determines United States price. Because the PRC has a nonmarket, state-controlled economy, the ITA did not base purchase price on the sales transactions between the PRC canneries and the China National Cereals, Oils and Foodstuffs Import and Export Corporation (CEROILS), a PRC-controlled foreign trading company, as plaintiff contends is proper, but on the sales transactions between CEROILS and United States importers.

In simplified terms, in determining antidumping margins in a case such as this, the ITA is to compare the price of goods in the home market (foreign market value) to the

---

**1.** At the applicable time 19 U.S.C. § 1677a (Supp. IV 1980) read in relevant part:

§ 1677a. **United States price**

**(a) United States price**

For purposes of this subtitle, the term "United States price" means the purchase price, or the exporter's sales price, of the merchandise, whichever is appropriate.

**(b) Purchase price**

For purposes of this section, the term "purchase price" means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from the manufacturer or producer of the merchandise for exportation to the United States. Appropriate adjustments for costs and expenses under subsection (d) of this section shall be made if they are not reflected in the price paid by the person by whom, or for whose account, the merchandise is imported.

United States price. If after appropriate adjustment it is found that the United States sales are being made at a significantly lower price than are home market sales, the ITA will determine that United States sales are at less than fair value (LTFV). This, coupled with a determination by the International Trade Commission that a competing United States industry is being materially injured or threatened with material injury because of the imports, will result in the imposition of antidumping duties on the foreign imports.

 CEROILS is not a manufacturer or producer of canned mushrooms, rather it is the agency by which the PRC introduces over 95% of its exported canned mushrooms into foreign commerce. 48 Fed.Reg. 45,445. Because it is not a manufacturer or a producer, CEROILS does not fit within the literal words of § 1677a(b), and plaintiffs, therefore, argue that CEROILS cannot be considered the seller in the sales transactions which determine United States purchase price. Plaintiffs argue that the correct sales transactions for purposes of determining United States purchase price are the transactions between the PRC canneries and CEROILS. Plaintiffs, however, concede that the PRC economy is state-controlled. They must concede, therefore, that the price between the canneries and CEROILS is state-controlled to some degree.[2] If it is state-controlled to any degree it is not a reliable price when compared to prices set entirely by market forces. For this reason the ITA, in determining United States purchase price, decided to look at the first sales transaction with some clearly established influence external to the PRC. While an agency's interpretation of a statute which it is bound to administer may not conflict with Congressional intent, the interpretation only need be reasonable. *Chevron, U.S.A., Inc. v. National Resources Defense Council,* —— U.S. ——, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), *reh'g denied,* —— U.S. ——, 105 S.Ct. 28, 29, 82 L.Ed.2d 921 (1984); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978). For the following reasons the court finds that the ITA's interpretation here does not conflict with Congressional intent and is reasonable.

 The parties agree that the version of the statute found at 19 U.S.C. § 1677a(b) (Supp. IV 1980) governs this case, but Congress, in 1984, clarified that statute by specifically codifying the methodology that the ITA employed in this case. Section 1677a(b) now provides that reseller's price may be used alternatively with the manufacturer's or producer's price in determining United States purchase price. Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 614, 98 Stat. 2948, 3036.[3] Although the amendment occurred after the transactions at issue, there is reason to believe that this method always has been consistent with Congressional intent. First, the approach used here was not new to the 1984 act. It was used in *Barium Carbonate from the People's Republic of China,* 49 Fed.Reg.

**2.** Although plaintiffs concede the state-controlled nature of the PRC economy, during oral argument plaintiffs indicated that the price set between producers and CEROILS was actually the result of external market forces. Plaintiffs admit that this fact is not in the record. Plaintiffs also failed to timely respond to the court's request for citations to the record to supplement the limited questionnaire response discussing the relationship of CEROILS and the producers to each other and to the state. Defendant, in turn, denied any features which, in a free-market economy context, would make the producers and CEROILS alter egos. Overall, based on the record, the court must assume that the PRC economy, and the relevant segment of that economy, is state-controlled.

**3.** 19 U.S.C. § 1677a(b), *as amended by* Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 614, 98 Stat. 2948, 3036, reads:

**(b) Purchase price**

For purposes of this section, the term "purchase price" means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States. Appropriate adjustments for costs and expenses under subsection (d) of this section shall be made if they are not reflected in the price paid by the person by whom, or for whose account, the merchandise is imported.

33,913 (Aug. 27, 1984); *Barium Chloride from the People's Republic of China,* 49 Fed.Reg. 33,916 (August 27, 1984); *Potassium Permanganate from the People's Republic of China,* 48 Fed.Reg. 57,347 (December 29, 1983) and *Carbon Steel Plate from Romania,* 47 Fed.Reg. 35,666 (August 16, 1982) (Preliminary). Thus, the agency charged with interpreting § 1677a(b) determined that use of reseller's price was appropriate in certain nonmarket economy cases. Such an interpretation is entitled to substantial weight. *Melamine Chemicals, Inc. v. United States,* 732 F.2d 924, 928 (Fed.Cir.1984). Second, when it enacted the reseller's price provision in 1984, Congress essentially ratified the practice followed in the administrative proceedings listed above. H.R.Rep. No. 1156, 98th Cong., 2d Sess. 185, *reprinted in* 1984 U.S. Code Cong. & Ad.News 4910, 5220, 5302, indicates that the reseller's price provision was not "explicit" prior to the 1984 Act. This implies strongly that the 1984 Congress believed that reseller's price was always an option, although Congress had not specifically provided for it. Although the court should not place too high a value on the views of one Congress as to the construction of a statute enacted by another Congress, *United States v. Southwestern Cable Co.,* 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968), the views of a subsequent Congress may be given some consideration in interpreting relevant Congressional intent. *Seymour v. Superintendent of Washington State Penitentiary,* 368 U.S. 351, 356–57, 82 S.Ct. 424, 427–28, 7 L.Ed.2d 346 (1962); *see Heckler v. Turner,* —— U.S. ——, 105 S.Ct. 1138, 1152–53, 84 L.Ed.2d 138 (1985); *Mattz v. Arnett,* 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973).

Defendant also cites to legislative history of the Trade Agreement Act of 1979 in support of its interpretation of the former version of § 1677a(b). *See* S.Rep. No. 249, 96th Cong., 1st Sess. 93–94 (1979); H.R. Rep. No. 317, 96th Cong., 1st Sess. 75 (1979), U.S.Code Cong. & Admin.News 1979, 381. Defendant argues that these legislative documents indicate that Congress was aware of and approved of the use of reseller's price in market economy cases as well as in nonmarket economy cases. In fact, in regards to transactions between unrelated parties, this legislative history does little more than reflect the words of the statute, that is, that producer's or manufacturer's price should be used to determine United States purchase price.

■ There is no reference in either the applicable statute or its legislative history to the problem of calculating United States price from a transaction totally internal to a nonmarket economy country and involving a controlled currency only. Where it is apparent that Congress did not think about a problem, it is incumbent upon the court to consider the policies underlying the statutory provision. *Rose v. Lundy,* 455 U.S. 509, 516–518, 102 S.Ct. 1198, 1202–1203, 71 L.Ed.2d 379 (1981), (citing *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975), "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. Heirs of Boisdoré,* 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)). *Accord Montana Power Co. v. Federal Power Commission,* 445 F.2d 739, 746 (D.C.Cir. 1970). The relevant policy is apparent in another provision of the antidumping law.

For a number of years Congress has recognized that adjustments need be made when dealing with foreign market value in countries with state-controlled economies. *See* 19 U.S.C. § 1677b(c) (1982) [4]; S.Rep.

---

**4.** 19 U.S.C. § 1677b(c) (1982) provides:

**(c) State-controlled economies**

If available information indicates to the administering authority that the economy of the country from which the merchandise is exported is State-controlled to an extent that sales or offers of sales of such or similar merchandise in that country or to countries other than the United States do not permit a determination of foreign market value under subsection (a) of this section, the administering authority shall determine the foreign market value of the merchandise on the basis of the normal costs, expenses, and profits as reflected by either—

No. 1298, 93rd Cong., 2nd Sess. 174 (1974), U.S.Code Cong. & Admin.News 1974, 7186. In determining foreign market value, pursuant to § 1677b(c) the ITA is permitted to disregard actual sales transactions in nonmarket economy countries such as the PRC. Values derived from such transactions are considered unreliable because the state-controlled nature of the economy prevents ordinary market forces from setting prices. Accordingly, in this case the ITA chose the value derived from home market sales in a surrogate country, Indonesia, for comparison purposes with United States price. The ITA reasoned that the economy of Indonesia, although not state-controlled, is at the same general level of economic development as the PRC's. 48 Fed.Reg. 45,445.

Congressional intent, as manifested in the surrogate country provision for calculating foreign market value, requires the ITA to adjust its procedures to deal with the unreliability of values derived from internal nonmarket economy transactions. 19 U.S.C. § 1677b(c)(1) (1982). The Finance Committee, in discussing the Trade Act of 1974 surrogate country provisions stated:

> The Committee is concerned that the technical rules contained in the Act are insufficient to counteract dumping from State-controlled-economy countries where the supply and demand forces do not operate to produce prices, either in the home market or in third countries, which can be relied upon for comparison purposes.

S.Rep. No. 93–1298, 93rd Cong., 2nd Sess. 174, *reprinted in* 1974 U.S.Code Cong. & Ad.News, 7186, 7311. Thus, Congress, even prior to 1984, surely intended that some adjustment be made in procedures for calculating the corresponding United States price when ordinary procedures result in unreliable values. Because of the

state-controlled nature of the economy in question, as reflected in the administrative record, Congress would have intended that the ITA adjust its procedures in order to arrive at a more correct United States price.

 Given the legislative background and development discussed above, the bare words of the statute cannot stand in the way of a rational agency decision to disregard a transaction which results in an unreliable value for United States price. *See Lynch v. Overholser*, 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962). The ITA was reasonable in basing United States price on the transaction between the reseller, CEROILS, and the United States importers.

Accordingly, the final determination of the ITA finding no LTFV sales is sustained and this action is dismissed.

---

(1) the prices, determined in accordance with subsection (a) of this section, at which such or similar merchandise of a non-State-controlled-economy country or countries is sold either—

(A) for consumption in the home market of that country or countries, or

(B) to other countries, including the United States; or

(2) the constructed value of such or similar merchandise in a non-State-controlled-economy country or countries as determined under subsection (e) of this section.