**BADGER–POWHATAN, A DIVISION OF FIGGIE INTERNATIONAL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**Rubinetterie A. Giacomini, S.P.A., Intervenor.**

**Court No. 85–4–00467.**

United States Court of International Trade.

April 2, 1986.

See also, D.C., 638 F.Supp. 344.

Stewart & Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr.), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Velta A. Melnbrencis, Civil Div., Dept. of Justice, for defendant.

Law Office of Larry Klayman, P.C. (Larry Klayman, John M. Gurley), for intervenor.

## OPINION

RESTANI, Judge:

In this action, plaintiff, Badger-Powhatan, a division of Figgie International, Inc., challenges the method of calculation used to determine the less than fair value (LTFV) margin in the antidumping duty order issued by the United States Department of Commerce International Trade Administration (ITA) regarding certain brass fire protection products from Italy. 50 Fed.Reg. 8354 (1985). Specifically, plaintiff claims ITA erred by failing to recalculate the LTFV margin after the International Trade Commission (ITC) determined that only a subclass of the class of merchandise sold at LTFV is causing material injury to an industry in the United States. Plaintiff has moved for judgment upon the agency record on the merits of its position.[1] CIT Rule 56.1. In response, defendant seeks a remand of the action for a recalcu-

---

**1.** Plaintiff also moves for access to confidential documents under protective order. Defendant opposes this motion, contending that release of these documents to plaintiff is unnecessary if the action is remanded for recalculation of the LTFV margin in accordance with plaintiff's position. Plaintiff's counsel indicated at oral argu-

ment that should the court remand the ITA final determination for recalculation, there would be no need to reach this issue inasmuch as the agency historically has provided access to such documents at the administrative level. Therefore, the court dismisses this motion without prejudice.

lation of the LTFV margin in accordance with the method proposed by plaintiff. Intervenor, Rubinetterie A. Giacomini, S.P.A. (Giacomini), opposes the positions of both plaintiff and defendant. It contends that the original determination is correct and that a recalculation of the LTFV margin is prohibited by statute.

The basic facts underlying this controversy are undisputed. Plaintiff is a domestic producer of brass fire protection products. On January 3, 1984, plaintiff filed an antidumping petition with ITA and ITC pursuant to 19 U.S.C. § 1673a(b) (1982). The petition alleged that imports of brass interior fire protection products were being, or were likely to be, sold in the United States, at less than their fair value. In addition, the petition alleged that such products materially injured or threatened to materially injure the domestic industry producing interior fire protection products. *See* 19 U.S.C. § 1673a(b)(1) (1982); 19 U.S.C. § 1673 (1982 & West Supp.1985). The petition defined the class or kind of imported merchandise as brass valves, connections, nozzles, and couplings which serve as components in interior fire protection systems to control the flow and direction of water through such systems. The specific products involved were described as:

1.  fire hose couplings (1½ and 2½ inch),
2.  fog/straight steam nozzles (1½ and 2½ inch),
3.  angle-type hose valves (1½ and 2½ inch),
4.  wedge-disc hose gate valves (2½ inch),
5.  single and double clapper siamese fire department connections (2½ inch inlet and 4 inch outlet),
6.  pressure restricting valves, and
7.  pressure regulating valves.[2]

On February 21, 1984, in response to plaintiff's petition, ITA published notice of initiation of antidumping investigations. *See* 19 U.S.C. § 1673a(c)(2) (1982) (requires ITA to make determination on petition and, if determination is affirmative, to commence investigation and publish notice in *Federal Register*); 49 Fed.Reg. 6396 (1984) (notice of initiation of antidumping investigations at issue). The notice of initiation of investigations indicates that the investigations were to cover the seven products described in plaintiff's petition. 49 Fed.Reg. 6396 (1984).

ITC issued a preliminary determination on March 1, 1984, that concluded that there was a reasonable likelihood that the brass fire protection products under investigation were causing material injury to United States industries. *Certain Valves, Nozzles, and Connectors of Brass from Italy for Use in Fire Protection Systems*, U.S.I. T.C. Public. 1500, Investigation No. 731–TA–165 (Preliminary), 49 Fed.Reg. 4046 (1984); 19 U.S.C. § 1673b(a) (1982). On July 10, 1984, ITA published an affirmative preliminary determination of sales at LTFV. 49 Fed.Reg. 28,083 (1984); 19 U.S.C. § 1673b(b) (1982). This determination was also based on an investigation that included all seven products. At that time ITA preliminarily determined the weighted-average margin of sales at LTFV to be 1.16%. *Id.* at 28,083, 28,084.

On November 30, 1984, ITA published its final affirmative determination of sales at LTFV. 49 Fed.Reg. 47,066 (1984). ITA identified the merchandise covered by the investigation as the same seven products. *Id.* at 47,066, 47,067. The determination announced a weighted-average LTFV margin of 3.47% for this class or kind of merchandise. *Id.* at 47,073. Following the signing of the final LTFV determination, the confidential versions of computer print-

---

**2.** In its documents relating to this antidumping investigation, ITA identifies these products by their *Tariff Schedules of the United States* item numbers as well as by their names. 49 Fed.Reg. 47,066 (1984). The products are currently classified under the following *TSUS* numbers:

1.  fire hose couplings—657.3540,
2.  fog/straight steam nozzles—680.1480,
3.  angle-type hose gate valves—680.1440,
4.  wedge-disc hose gate valves—680.1430,
5.  single and double clapper siamese fire department connections—680.1420,
6.  pressure restricting valves—680.1440, and
7.  pressure regulating valves—680.2740.

outs containing LTFV margin calculations were disclosed to counsel for both Badger-Powhatan and Giacomini. After examining the data, counsel for Giacomini and Badger-Powhatan identified clerical and factual errors in the analysis. In response to these comments, ITA published an amendment to its final affirmative LTFV determination, changing the weighted-average LTFV margin for all seven categories of merchandise to 1.28%. 50 Fed.Reg. 1099 (1985).

Subsequent to the ITA determination that the seven products were being sold at LTFV, ITC issued its final determination on material injury. *Certain Valves, Nozzles, and Connectors of Brass from Italy for Use in Fire Protection Systems,* U.S.I. T.C. Public. 1649, Investigation No. 731–TA–165 (Final), 50 Fed.Reg. 7971 (1985); 19 U.S.C. § 1673d(b) (1982 & West Supp.1985). ITC, by majority decision, determined that industries in the United States are materially injured by reason of imports from Italy of single and double clapper siamese connections and pressure-restricting valves. It further found that the other five products from Italy were not causing or threatening to cause material injury to a United States industry.

After being notified of the ITC findings, ITA published an antidumping duty order. *Antidumping Duty Order: Certain Brass Fire Protection Products from Italy,* 50 Fed.Reg. 8354 (1985); 19 U.S.C. § 1673e (1982). The order identified the merchan-

dise covered by the investigation as the original seven products. It then noted the material injury findings of ITC, and issued the following order:

[T]he Department directs United States Customs officers to assess ... antidumping duties equal to the amount by which the foreign market value of the merchandise exceeds the United States price for all entries of certain brass fire protection products, which include single and double clapper siamese fire department connections and pressure restricting valves.

50 Fed.Reg. 8354–55. These duties are to be assessed solely on imports of single and double clapper siamese fire department connections and pressure restricting valves from Italy.[3] *Id.* at 8355. The estimated weighted-average antidumping duty margin adopted was that published in the amended final affirmative LTFV determination (1.28%), based on data on the aggregate value of Giacomini's U.S. sales of all seven products. *Id.;* 50 Fed.Reg. 1099.

Plaintiff now moves for judgment upon the agency record on the issue of the propriety of ITA's calculation of the estimated antidumping duty deposit rate based upon the weighted-average LTFV margin for all seven product categories.[4] Plaintiff argues that data relevant to the five product categories not subject to antidumping duties should not have been included in the

---

**3.** In an independent proceeding before this court, plaintiff challenged the ability of ITA to issue an order that imposes duties on only a subset of the class or kind of merchandise as to which ITA has made an affirmative LTFV sales determination. This court held that an antidumping duty order cannot direct Customs to assess duties on a product unless ITA determines that it is in a class or kind of merchandise being sold at LTFV *and* ITC determines that the merchandise to be dutied is causing material injury to a domestic industry. *Badger-Powhatan v. United States,* 9 CIT ——, 608 F.Supp. 653, 656 (1985). The statute arguably could have been interpreted by the agency and the court to require duties to be imposed on the entire LTFV "class or kind of merchandise," as defined by ITA, so long as any industry in the United States was being injured by reason of imports within the defined class. The court reasoned, however, that ITC was required to

determine which industry or industries are injured, according to specific statutory requirements. 19 U.S.C. §§ 1673(2), 1677(4)(A), (10) (1982 & West Supp.1985). In this case, a majority of the commissioners found seven different industries to exist, only two of which were injured by reason of merchandise in the class defined by ITA. The court went on to approve, as consistent with the statutory scheme, the ITA practice of imposing duties only on merchandise "like" merchandise produced by the injured industry. *Badger-Powhatan,* 9 CIT at ——, 608 F.Supp. at 657.

**4.** Plaintiff originally pled three counts against defendant. In its motion for judgment upon the agency record, plaintiff withdrew Counts I and III. Consequently, only Count II of the complaint is at issue here.

LTFV margin calculations.[5] Instead, plaintiff contends, the estimated antidumping duty deposit rate should be based solely upon the weighted-average LTFV margin for the two product categories identified in the antidumping order. Defendant responds by agreeing to base future deposits of estimated duties upon a recalculated LTFV margin determined for the two products involved. To this end, it seeks a remand of the action to ITA for recalculation of the LTFV margin and amendment of the order. On the other hand, intervenor Giacomini contends that ITA's use of a weighted-average LTFV margin that includes margins for the entire class or kind is proper under these circumstances. Furthermore, it contends that a recalculation of the LTFV margin would constitute a prohibited second final determination. Intervenor, then, not only challenges the grounds supporting a change in the order, but also ITA's authority to implement such a change.

The first issue the court must address is whether ITA, having rendered its final determination as to the LTFV margin, may now alter the basis of its calculation.[6] It is now well established that amendment, before or after remand, is appropriate when the agency has utilized a legally improper method in making a determination or when the original determination contains an error of inadvertence or mistake. *Timken Co. v. United States*, 10 CIT ——, 630 F.Supp. 1327, 1332 (1986); *Melamine Chemicals, Inc. v. United States*, 8 CIT ——, 592 F.Supp. 1338, 1340 (1984); *Timken Co. v. United States*, 7 CIT ——, Slip Op. 84–63 at 3 (June 5, 1984); *Gilmore Steel Corp. v. United States*, 7 CIT ——, 585 F.Supp. 670, 674 (1984).[7] The court notes that all parties, including intervenor, seemed to accept the concept of amended final determinations when they participated

---

5. These five products constituted 71% of the class or kind of merchandise originally subject to the investigation. *Badger-Powhatan v. United States*, 9 CIT ——, 608 F.Supp. 653, 657 n. 2 (1985).

6. In their briefs plaintiff and defendant appear to characterize the proposed recalculation as an amendment to the antidumping order, not as an amendment to ITA's final determination. This characterization is incorrect. It is clear that an antidumping order may not vary the terms of the underlying determination. *Royal Business Machines, Inc. v. United States*, 1 CIT 80, 86, 507 F.Supp. 1007, 1012 (1980), *aff'd*, 69 CCPA 61, 669 F.2d 692 (1982). Because LTFV margins for the various products were not separately stated in the ITA final determination, the determination must be amended if the LTFV margin derived from the seven product categories is incorrect. The amended final determination will then be incorporated into the order in accordance with 19 C.F.R. § 353.48 (1985), which reads in pertinent part:

> (b) *Calculation of the amount of the estimated duty to be deposited.* The deposit of estimated antidumping duties for each manufacturer, producer or exporter shall be equal to the amount by which the foreign market value of the merchandise exceeds the United States price of the merchandise, as determined in the affirmative final determination of the Secretary or the latest administrative review of such determination under § 353.53, or, if appropriate, under § 353.49.

7. *Compare with Ceramica Regiomontana, S.A. v. United States*, 5 CIT 23, 557 F.Supp. 596 (1983), in which this court held that when a subsidy is eliminated after the issuance of a countervailing duty order, ITA does not have the authority to modify the estimated countervailing duty deposit rate outside the scope of the provisions of 19 U.S.C. §§ 1675(b) (changed circumstances) and 1675(a) (periodic review). *Ceramica Regiomontana*, 5 CIT at 29–30, 557 F.Supp. at 602. Intervenor cites *Ceramica Regiomontana* for the proposition that ITA does not have statutory authority to issue a second final determination after issuance of an ITC final material injury determination inasmuch as the cited provisions adequately protect the interests of those seeking change. Contrary to intervenor's position, the court considers *Ceramica Regiomontana* to be consistent with the *Gilmore* line of cases. *Ceramica Regiomontana* involved a situation in which an event occurred *after* the issuance of the order that changed the facts upon which the calculation was made. *Id.* at 24, 557 F.Supp. at 598. In contrast, the case at bar involves a situation in which none of the underlying facts have changed, but one of the parties challenges the basis for the original calculation. Under *Melamine* and *Ceramica Regiomontana*, if the original calculation is in error, then the final determination may be amended; on the other hand, if circumstances affecting the calculation change after the issuance of the order, then the adjustment must be made pursuant to the changed circumstances or periodic review provisions.

in the calculation of a reduced LTFV margin following the original determination. *See* discussion *supra*.

■ The question has arisen as to whether the court may remand this matter without considering the merits. There is no indication anywhere in the statutory scheme that the agency, for policy or similar reasons, may simply change a final determination after an antidumping order is issued. If there is such a provision, defendant has not cited it. The court believes, rather, that Congress expected a single and prompt final determination. After all, it provided very short time limits for decision-making. *See* 19 U.S.C. § 1673d(a) (1982 & West Supp.1985). If the agency could amend determinations endlessly, it would be difficult to answer the question as to when a *final* determination would ever be made. The Supreme Court has ruled that the Interstate Commerce Commission cannot, without specific statutory authority, reconsider license and certificate decisions because of policy changes. *American Trucking Association v. Frisco Transportation Co.*, 358 U.S. 133, 146, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958); *United States v. Seatrain Lines*, 329 U.S. 424, 429–33, 67 S.Ct. 435, 437–39, 91 L.Ed. 396 (1947). This principle has been applied in other licensing cases. *See, e.g., Hirschey v. Federal Energy Regulatory Commission*, 701 F.2d 215 (D.C.Cir.1983). This situation is analogous. The original determination and order resulted in a deposit rate which affects both domestic and foreign interests, just as a license decision affects those whose businesses must be licensed. The statute contains no exceptions to the general rule that these adjudicatory-type decisions, which are relied upon, may later be changed for policy reasons, and the parties have cited no applicable judicial exceptions to the rule. That this principle may give way when errors are committed does not give the agency authority to upset final decisions where no errors have occurred.

Therefore, in order to determine if remand is appropriate, the court must rule on plaintiff's motion for judgment on the agency record.

To determine whether ITA erred in not performing the recalculation, the court must ascertain whether Congress intended that a LTFV recalculation occur in a situation in which the injury determination narrows the potential scope of the antidumping order and information is available in the administrative record from which to perform the recalculation. The parties offer different theories as to Congress' intent. Intervenor argues that the statutory scheme clearly precludes such a recalculation. Plaintiff argues that the legislative history indicates that a new calculation must be undertaken. Defendant agrees with plaintiff as to the results of this case, but it is difficult to determine if defendant believes it could reasonably arrive at a contrary result in a similar situation.[8]

The statute, of course, is our primary guide in determining Congress' intent. *United States v. Hepp*, 497 F.Supp. 348, 349 (N.D.Iowa 1980), *aff'd*, 656 F.2d 350 (8th Cir.1981) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1977); *Scarborough v. United States*, 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1976)) ("[T]he starting point in any case involving the interpretation of a statute is the statute itself."). Intervenor notes that the statutory scheme provides for, in chronological order, a LTFV final determination (19 U.S.C. § 1673d(a)(1) (1982)), a final injury determination (19 U.S.C. § 1673d(b) (1982 West Supp.1985)), and a final order (19 U.S.C. § 1673e(a) (1982)). Intervenor argues that there is no room in the statutory scheme for a new determination modifying the LTFV determination where the products found to be causing injury are fewer than the products con-

---

**8.** The court is of the opinion that if the facts of this case would allow ITA's original opinion to stand as a reasonable exercise of agency discretion, then remand is not appropriate. The court finds no support for remand to alter reasonable discretionary decisions where there is an objecting party. *See* discussion *supra*.

sidered in arriving at the original LTFV margins.[9] Intervenor further argues that the high probability that LTFV margins will be inaccurate in situations in which the margin is based in part on imports not causing material injury is irrelevant. It notes that the LTFV margin contained in the antidumping duty order is considered an estimate, and that although the importer is required to deposit these estimated duties, the actual duties will be assessed based on the LTFV margin calculated during the section 751 periodic review. 19 U.S.C. § 1673e(a)(3) (1982) (deposit of estimated antidumping duties); 19 U.S.C. § 1675 (1982 & West Supp.1985) (periodic review). Therefore, actual duties may vary substantially from estimated deposits even where there is no inconsistency between the ITA and ITC determinations.

■ Intervenor's argument focuses too closely on what is contained in the statute, without considering what is missing from the express statutory scheme. *United States v. Morton*, 467 U.S. 822, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680, *reh'g denied*, — U.S. — 105 S.Ct. 27, 82 L.Ed.2d 920 (1984) (statutes should be read as a whole); *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975) (same). Intervenor ignores the fact that Congress failed to tell ITA how to calculate the estimated antidumping duties. For example, 19 U.S.C. § 1673e(a)(3) (1982) states that ITA shall publish an antidumping duty order which "requires the deposit of estimated antidumping duties pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited." This provision does not provide any guid-

ance as to how to calculate the estimated duties to be deposited. The only guidance as to calculation is provided in the overview provision, 19 U.S.C. § 1673 (1982 & West Supp.1985), which states that once an affirmative LTFV determination and material injury determination are made as to certain merchandise, "then there shall be imposed upon *such merchandise* an antidumping duty ... in an amount equal to the amount by which the foreign market value exceeds the United States price for *the merchandise*." (Emphasis added.) This court has defined the term "such merchandise" as merchandise which is both in a class of merchandise being sold at LTFV *and* which is causing material injury to a domestic industry. *Badger-Powhatan v. United States*, 9 CIT ——, 608 F.Supp. 653, 656 (1985). Intervenor conceded at oral argument that the term "the merchandise" at the end of that sentence refers to the same merchandise as does the term "such merchandise." Thus, the antidumping duty actually imposed should be based, as far as is possible, on the LTFV margin for the merchandise that is actually subject to the duty. Intervenor argues that section 1673 does not address how estimated antidumping duties should be calculated, but only the manner of calculation of actually imposed duties. The agency, however, may have concluded that it is to calculate estimated deposits in the same way, inasmuch as the initial language of the regulation describing how ITA is to calculate the amount of estimated duty to be deposited, echos the language of section 1673. 19 C.F.R. § 353.48(b) (1985); *see supra* note 6.[10] It should be noted that defendant does

---

**9.** Intervenor notes the possibility of a situation akin to the hypothetical conflicts problem of the endless "renvoi" if commissioners consider margins in making injury determinations, a current practice of some commissioners. *See, e.g., Iron Construction Castings from Canada*, U.S.I.T.C. Public. 1811, Investigation No. 731–TA–263 at 9 n. 34, 15 n. 56, 25, 40–41 (1986), *Heavy-Walled Rectangular Welded Carbon Steel Pipes and Tubes from Canada*, U.S.I.T.C. Public. 1808, Investigation No. 731–TA–254 at 13–14 (1986). Thus far, there has been no court determination sanctioning the use of margins analysis in arriv-

ing at an injury determination. If such practice is approved, the possibility of a true endless "renvoi" is too remote to be considered. Margins analysis is also more likely in cases where the margin is small and a negative determination is made. Here the margin will increase, and thus, there is no likelihood of further negative injury determinations as to specific products.

**10.** If this is so, there apparently was a failure to consider this construction in connection with

not argue for this particular construction of its regulation.

■ Neither the statute, as indicated, nor the legislative history, explicitly refers to the question of recalculation when the ITA and ITC final determinations vary in scope. When such a legislative gap occurs, the court can infer that Congress did not consider the problem at issue. In such a case, "it is incumbent on the court to consider the policies underlying the statutory provision." *Four "H" Corp. v. United States*, 9 CIT ——, 611 F.Supp. 981, 984 (1985) (citing *Rose v. Lundy*, 455 U.S. 509, 516–18, 102 S.Ct. 1198, 1202–03, 71 L.Ed.2d 379 (1982) ).

■ The court notes the Supreme Court's admonition that in filling interstitial silences in statutes courts must proceed with caution and attend to the view of the administrative entity appointed to enforce the statute. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980). Intervenor argues that past ITA actions in cases similar to the one at bar constitute an interpretation of the statute by those officers charged with its administration. If this is so, such an interpretation would be entitled to considerable deference by the court. *Securities Industry Association v. Board of Governors*, 468 U.S. 137, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107 (1984); *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986).

■ The court has looked at three cases cited by the parties to analyze ITA's decision-making in this area. In two cases relied on by intervenor, in which the ITC material injury determination was narrower in scope than the ITA LTFV determination, ITA, as it did in this case, apparently adopted without change the LTFV weighted-average margin contained in the ITA final determination. *Rectangular Welded*

the *Carbon Steel Pipes* and *Color Television Receivers* administrative decisions discussed *infra*.

*Carbon Steel Pipes and Tubes from the Republic of Korea*, 49 Fed.Reg. 9936, 9939 (1984) (final determination of sales at LTFV); 49 Fed.Reg. 20,045 (1984) (antidumping duty order); *Color Television Receivers from Taiwan*, 49 Fed.Reg. 7628, 7638 (1984) (final determination of sales at LTFV), 49 Fed.Reg. 18,337, 18,338 (1984) (antidumping duty order). In contrast, in a third case, ITA recalculated the LTFV margin after the ITC determination eliminated one product from the scope of the order. *High-Capacity Pagers from Japan*, 48 Fed.Reg. 28,682, 28,688 (1983) (final determination of sales at LTFV), 48 Fed.Reg. 37,058, 37,059 (antidumping duty order). Defendant has not offered any explanation of how or why ITA recalculated the margin in the *High-Capacity Pagers* situation, but not in the *Carbon Steel Pipes* and *Color Television Receivers* contexts. In giving weight to an administrative determination, a court should consider not only its consistency with other pronouncements but the validity of the reasoning underlying it. *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287–88 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978). Here there is no consistency and ITA offers no explanation for the inconsistency.

The other parties offer various explanations for the mixed results. Plaintiff suggests that the margins would not have been significantly affected in the first two cases, but that a significant difference in the third case mandated a recalculation. The difference, in fact, was significant in the third case, but no facts were presented regarding the potential change in the first two cases. Intervenor notes that the original determination in the third case stated separate LTFV margins for the relevant products. Thus, no amendment of the determination was required. In this case, the LTFV margins were not separately stated for each product, therefore, a recalculation based on review of the record would be required.[11] Although intervenor's explana-

11. In this regard the *High Capacity Pagers* case is similar to *Blaw Knox Construction Equipment Co. v. United States*, 8 CIT ——, 596 F.Supp. 476

tion is intriguing, there is no statement from the concerned agency that this is its reasoning. In fact, its latest position in this case would indicate that it does not share this view. The court itself has difficulty accepting intervenor's formalistic approach. That approach would make the decision as to whether to apply a more accurate deposit rate solely the result of chance. That is, if ITA decides for whatever unrelated reason to state LTFV margins separately in its final determination, the deposit rates will be fairly accurate. If not, rates totally unrelated to the correct duty may be imposed. Furthermore, even if the three opinions should be harmonized in this way, it is difficult to say that three unexplicated decisions made during a short and recent time period constitute a consistent administrative practice, especially in light of the agency's new position. In any case, if there is an agency practice to be given weight in this case, the court is simply at a loss as to what that practice is.

■ Plaintiff has directed the court's attention to legislative history which demonstrates the importance that Congress placed on the deposit of the estimated duties. In particular, the report of the House Committee on Ways and Means indicates that the Committee viewed the inclusion of a provision requiring the deposit of estimated dumping duties as a critical change intended to expedite the assessment of antidumping duties. In discussing the new requirement that merchandise subject to an antidumping order be entered only upon deposit of estimated duties, the Committee stated:

> The Committee feels strongly that this practice [of allowing such merchandise to enter under bond] does not sufficiently deter dumping. Rather, it provides an incentive to exporters and importers to

delay in submitting the information necessary to form the basis of an assessment. The Committee believes that the requirement of cash deposits will ensure that complete information will be submitted to the Authority in a timely manner.

H.R.Rep. No. 317, 96th Cong., 1st Sess. 69 (1979). Under the circumstances of this case, Congress' intent to prevent exporters and importers from delaying in providing information for accurate assessment of duties is furthered by tailoring the LTFV margins to only those products subject to the order. If the estimated duties are substantially less than the actual duties as a result of the failure to recalculate, then exporters and importers will benefit by delaying the calculation of actual duties. This potential problem is compounded by the fact that the first assessment of actual duties may not occur for approximately two years after the issuance of the order, 19 U.S.C. § 1675(a)(1) (1982 & West Supp. 1985), during which time the exporter or importer would deposit only a fraction of the amount of duties necessary to compensate for the dumping.[12]

■ Reading this legislative history to support recalculation in this case does not conflict with the statutory scheme. That the statute provides for only one final ITA determination is not dispositive. First, as discussed previously, various situations may give rise to valid amended determinations. Second, ITA could have avoided making a new amended determination by providing separate LTFV margins for each product. That, not foreseeing the ITC result, ITA chose to state an average margin for reasons of convenience does not relieve it of the burden of producing a proper calculation from information already avail-

(1984) (corrected cash deposit instructions issued to Customs based on figures in an annual review determination).

**12.** Of course, there is the possibility that in other cases inclusion of the margins of non-injurying products would raise the deposit rate. This possibility does not prevent the conclusion

that Congress favors reasonably accurate deposits. In theory, a duty rate that allows the foreign and domestic products to compete on an equal basis is what Congress intended, not a rate that puts the domestic product in an advantageous position.

able in the original administrative record.[13] In the absence of any definitive guidance it is sufficient justification for the court's conclusion that the result reached is both logical and fair, as well as not unduly burdensome. Therefore, the court concludes that the statutory scheme requires that estimated antidumping duties be as closely tailored to actual antidumping duties as is reasonable given data available to ITA at the time the antidumping order is issued.[14]

There is no room here for a result which would allow the erroneous deposit rate to continue in this case, based on a contrary discretionary or policy decision. Therefore, ITA did make an error which should now be corrected. The recalculation shall be based on information available from the record and an amended final determination shall be issued containing the recalculated LTFV margin. An antidumping duty order will then be issued reflecting the findings of the ITC final affirmative material injury

determination and the ITA amended final affirmative LTFV determination.

## JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED: that plaintiff's motion for judgment on the agency record is granted. This case is remanded to the Department of Commerce International Trade Administration for issuance of an amended final determination as described in the accompanying opinion.

**13.** The recent case of *Alsthom Atlantique v. United States,* 787 F.2d 565 (Fed.Cir.1986) left open the question of whether merchandise with de minimus or zero LTFV margins may be included within the scope of ITA determinations. Apparently ITA has allowed this. With this practice in mind, intervenor opines that the court's ruling today would allow a "no duty" situation in certain cases where there are affirmative ITA and ITC decisions. The court suggests that this is not likely. For example, assume products A and B compose the "class or kind of merchandise" being sold at LTFV. Product A has a zero margin and product B has a 10% margin. ITC then determines that there are two domestic industries, one for product A and one for product B. There is a negative determination with regard to industry B. Given the causal nexus required between LTFV imports and injury, it is not likely that ITC will render an affirmative determination as to industry A. Only if product B somehow competes with goods from industry A, could ITC make a positive finding. This seems unlikely, if not impossible, since ITC, in finding that there are two different industries, would have already found that products A and B were not alike, that is, did not have the same uses and characteristics. Assuming, *arguendo,* that the court has not foreseen all possibilities, the court nonetheless concludes that it will not rewrite the statute to avoid hypothetical anomalies. Congress may not have foreseen all of the possible results of separating LTFV and injury decision-

making, and Congress may choose to amend the statute if it finds untenable the remote chance of such anomalous results occurring.

**14.** Contrary to intervenor's contentions, this court's decision in *Diversified Products Corp. v. United States,* 7 CIT ——, 572 F.Supp. 883 (1983), does not dictate otherwise. In *Diversified Products,* ITA requested a remand in order to adjust the deposit rate for Diversified's imports based on a percentage derived from the weighted-average rate computed for all responding firms. Diversified challenged the imposition of estimated cash deposits because ITA had never computed a dumping margin for one of the products of Diversified's primary supplier. The court rejected Diversified's claim, noting that the statute only requires the deposit of *estimated* duties. The court stated that "[t]here is no statutory support for Diversified's theory that if there is insufficient data available to assess absolutely accurate amounts for such duty deposits that they may not be required until the next section 751 review." *Id.* at ——, 572 F.Supp. at 890. *Diversified Products* stands for the proposition that the estimated duty deposit rate does not have to be absolutely accurate. Rather, it may approximate the actual duties when ITA lacks sufficient data to make an accurate calculation. This holding, however, does not indicate that ITA may derive an unnecessarily inaccurate estimated duty deposit in a case in which a more accurate calculation can be made based on available data.