**BÖHLER–UDDEHOLM CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Allegheny Ludlum Steel Corporation, Washington Steel Corporation, and G.O. Carlson, Inc., Defendant–Intervenors.**

**Slip Op. No. 96–184.**
**Court No. 95–08–01024.**

United States Court of International Trade.

Nov. 14, 1996.

O'Donnell, Byrne & Williams, Chicago, IL (R. Kevin Williams and Michael A. Johnson) for plaintiff.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC (Randi–Sue Rimerman), Carlos A. Garcia, Attorney–Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Collier, Shannon, Rill & Scott, PLlC, Washington, DC (Paul C. Rosenthal, John B. Brew and Jeffrey S. Beckington), for defendant-intervenors.

**1.** Commerce issued two letter rulings. The first, dated July 11, 1995, concerned the scope of the 1973 dumping finding on stainless steel plate from Sweden with regard to three products, Stavax, Ramax and UHB 904L, when flat rolled. *Stainless Steel Plate from Sweden*, (Dep't Comm. 1995) (final scope ruling and mem., flat rolled products) at 21; Pl.'s App., Ex. 2. The second, dated November 2, 1995, concerned the same 1973 scope finding with regard to the same three products when forged. *Stainless Steel Plate from Sweden*, (Dep't Comm.1995) (final scope ruling and mem., forged products) at 33; Pl.'s App., Ex. 3. Neither letter was published in the Federal Register.

*OPINION*

RESTANI, Judge:

This case is before the court on plaintiff Böhler–Uddeholm Corporation's ("Böhler–Uddeholm") Rule 56.2 motion for judgment upon the agency record. Böhler–Uddeholm filed this action challenging the defendant United States Department of Commerce's ("Commerce") antidumping findings [1] that flat rolled and forged UHB Stavax ("Stavax") and UHB Ramax [2] ("Ramax") are within the "class or kind of merchandise" covered by the antidumping finding issued in *Stainless Steel Plate from Sweden,* 38 Fed.Reg. 15,079, 15,079 (Treas. Dep't 1973). Böhler–Uddeholm contends that Commerce's antidumping findings were unsupported by substantial evidence on the agency record and not in accordance with law. The court remands this matter to Commerce to: (1) apply the 1976 standards to determine whether Treasury erred in its post-finding scope determination, and (2) if Treasury erred, correct the antidumping scope determination by applying the standards in effect in 1976.

## BACKGROUND

Since 1972, Böhler–Uddeholm has manufactured Stavax and Ramax, two specially alloyed grades of steel which are produced and marketed solely for use in making molds (Stavax) and mold holders (Ramax). The majority of Böhler–Uddeholm's imports consist of forged Stavax and Ramax, although Böhler–Uddeholm also imports a flat rolled version of the products.

Stavax and Ramax meet the TSUS [3] and

**2.** Both letter rulings included UHB 904L in the class or kind of merchandise of stainless steel plate. UHB 904L is not produced by Böhler–Uddeholm and Commerce's determination with respect to UHB 904L is not contested.

**3.** The Tariff Schedule of the United States ("TSUS") defines stainless steel as "any alloy steel which contains by weight less than 1 percent of carbon and over 11.5 percent of chromium." TSUS Headnote 2(h)(iv) to Subpart B, Part 2, Schedule 6.

HTSUS[4] tariff definitions of stainless steel and do not meet the tariff definition of stainless tool steel. Notwithstanding the tariff definitions of the merchandise in issue, plaintiff contends that for purposes of this action and the antidumping finding of 1973, its products are stainless tool steel.[5] Böhler–Uddeholm does not produce any grade of AISI 300 or 400 series of stainless steel plate. Instead, Stavax and Ramax, whether flat rolled or forged, are considered modified AISI grades 420 and 420F because their exact alloy contents are not contained in any AISI specification. In addition, Böhler–Uddeholm has always marketed the products as stainless tool steel used for the making of plastic molds.

## A. 1973 Dumping Finding

Treasury issued its antidumping finding covering stainless steel plate from Sweden on June 5, 1973. Treasury's investigation began when Jessop Steel Co. ("Jessop"), a domestic producer, filed a petition with Treasury in 1972 alleging that Swedish stainless steel plate sold in the United States violated the Antidumping Act of 1921. In its petition, Jessop defined "stainless steel plate" as:

> a flat rolled product in thicknesses 0.1875 in. or more, and in widths over 10 in., having various finishes, although normally a No. 1 finish is supplied (hot rolled, annealed and pickled). The term "stainless" implies a resistance to staining, rusting and pitting in the air and generally defines a chromium content in excess of 11% but less than 30%.

Petition from Jessop Steel Co. at 53 (Apr. 20, 1972) [hereinafter "Petition"]; Pl.'s App., Ex.

8. Jessop attached to its petition a portion of the AISI Products Manual, which defined "plates" as "flat rolled or forged." Petition at 66.

The domestic industry's petition listed six major end-use markets for stainless steel plate, as well as other significant uses for the product.[6] In addition, Jessop provided examples of price comparisons between stainless steel plate sold in Sweden and imported Swedish stainless steel plate sold in the United States.[7] All of the listed examples concerned the AISI 300 series of stainless steel plate.

The Tariff Commission subsequently conducted its investigation of injury to the United States industry. The Tariff Commission noted that "[v]irtually all imports and the great bulk of U.S. production of stainless-steel plate are in four basic AISI grades [in the 300 series]." Tariff Commission Publ. 78, Stainless Steel Plate from Sweden Determination of Injury and Staff Report at 84 (May 1, 1973) [hereinafter "Treasury Determination of Injury"]; Pl.'s App., Ex. 11. In its finding of injury, however, the Tariff Commission reviewed import statistics for all grades of stainless steel plate.

The Tariff Commission also listed the capacities of all domestic producers considered as part of the injured domestic industry. Two companies were not included as part of the injured industry: Bethlehem Steel which was expressly excluded and Crucible Steel which was not mentioned at all. Treasury Determination of Injury at 94–100. These two companies made plastic mold steel, a product in direct competition with Stavax and Ramax.[8] While their products met the

---

4. The Harmonized Tariff Schedule of the United States ("HTSUS") defines stainless steel as "[a]lloy steels containing, by weight 1.2 percent or less of carbon and 10.5 percent or more of chromium, with or without other elements." HTSUS Section XV, Ch. 72, Note 1(e).

5. Tool steel is defined in terms of carbon content and chromium. HTSUS Section XV, Ch. 72, Addtl.U.S. Note 1(e).

6. The six major end-use markets for stainless steel plate are the: (1) chemical process industry, (2) petroleum industry, (3) pulp and paper industry, (4) shipbuilding and marine industry, (5) water and desalination equipment, and (6) power

generation equipment. Other significant uses for stainless steel plate include food and beverage processing equipment, textile manufacturing machinery and aerospace-aircraft equipment. Petition at 53–54.

7. The petition included a list of price comparisons of the AISI 304 and 316 grades of steel in various thicknesses. The petition notes that the list provides only examples of injury to the domestic industry. Petition at 59.

8. It is established that Bethlehem Steel and Crucible Steel manufactured plastic mold steel in 1976 as demonstrated by each company's bro-

tariff definition of stainless steel, the products were sold as stainless tool steel, as were Stavax and Ramax.

## B. 1976 Treasury Post–Finding Scope Determination

On June 17, 1976, Böhler–Uddeholm requested that Treasury issue a determination excluding Stavax and Ramax from the scope of the 1973 dumping finding. Letter from Böhler–Uddeholm to Customs Technical Branch at 160 (June 17, 1976); Pl.'s App., Ex. 13. Böhler–Uddeholm's letter presented two arguments. First, Stavax and Ramax were primarily stainless tool steels used for plastic molds. *Id.* at 161. Second, they did not compete with stainless steels in the AISI 300 series. Thus, Stavax and Ramax should be excluded from the scope of the class or kind of merchandise. In a letter dated November 16, 1976, Treasury excluded Stavax and Ramax from the 1973 dumping finding. Treasury concluded that Stavax and Ramax did not fall within the purview of the 1973 dumping finding "[i]nasmuch as the complaint failed to address itself to those varieties of steel, and based on the materials appended to [Böhler–Uddeholm's] memoranda ..." Treasury/Customs Mem. at 170 (Nov. 16, 1976); Pl.'s App., Ex. 16. Treasury also noted Jessop's omission of AISI 400 grades of stainless steel in its price comparison.

On April 18, 1989, Böhler–Uddeholm sent a letter to Commerce questioning Customs' request for cash deposits for antidumping duties on Stavax and Ramax. On August 3, 1990, in a one-page letter, Commerce summarily affirmed Treasury's November 16, 1976 ruling that Stavax and Ramax were not subject to the 1973 antidumping duty finding. Letter from ITA to Böhler–Uddeholm at 172 (Aug. 8, 1990); Pl.'s App., Ex. 18.

## C. The Contested Administrative Proceedings

On July 27, 1993, the domestic industry requested that Commerce clarify the scope of the 1973 dumping finding with respect to Stavax, Ramax, and UHB 904L. The domestic industry asserted that Treasury's 1976 ruling unlawfully excluded these products from the scope of the 1973 finding.

Commerce issued its preliminary scope determination by letter on November 17, 1994. Commerce concluded that the 1976 Treasury decision unlawfully narrowed the scope of the 1973 dumping finding by introducing two new scope criteria: a requirement that the product be included upon the list of models or grades in the petition, and a requirement that the product have the same end use as the models or grades listed in the petition. Commerce also concluded that Treasury's 1976 decision incorrectly interpreted the lists of grades and uses in the petition underlying the 1973 finding to be "exhaustive." Accordingly, after discounting the two additional criteria and reinterpreting the scope of the class or kind of merchandise under its current standards, Commerce preliminarily concluded that the 1973 finding covered all grades of stainless steel plate with the chemical composition and dimension specified in the petition and tariff schedules for stainless steel.

On July 11, 1995, Commerce issued a final determination by letter ruling, including flat rolled Stavax and Ramax within the class or kind of merchandise encompassed by the antidumping finding on stainless steel plate from Sweden. Commerce issued a second letter ruling on November 2, 1995, on forged Stavax and Ramax. After applying the *Diversified Products*[9] criteria, Commerce concluded that forged Stavax and Ramax were also within the scope of the original 1973 antidumping finding.

## STANDARD OF REVIEW

In reviewing a determination by Commerce that imported merchandise is covered by an existing antidumping duty finding, the court "shall hold unlawful any determination ... found ... to be unsupported by substantial evidence on the record, or otherwise not

---

chures. There is no specific information as to whether either company manufactured plastic mold steel in 1973.

9. *Diversified Prods. Corp. v. United States,* 6 CIT 155, 162, 572 F.Supp. 883, 889 (1983), sets forth the scope criteria now found at 19 C.F.R. § 353.29(i).

in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994).

## DISCUSSION

### I. Commerce Has The Authority to Reexamine Legally Improper Treasury Scope Determinations.

■ Commerce has the authority to clarify the scope of an antidumping finding, but this authority is not unlimited. *Mitsubishi Elec. Corp. v. United States,* 700 F.Supp. 538, 555 & n. 3 (CIT 1988), *aff'd,* 898 F.2d 1577 (Fed.Cir.1990). Commerce may "interpret the scope of a finding, [but] it cannot alter or amend that scope. Each stage of the statutory proceeding maintains the scope passed on from the previous stage." [10] *UST, Inc. v. United States,* 9 CIT 352, 356, 1985 WL 25772 (1985). It is equally well established that an agency may amend a determination when it has "utilized a legally improper method in making a determination or when the original determination contains an error of inadvertence or mistake." *Badger–Powhatan, A Div. of Figgie Int'l v. United*

*States,* 10 CIT 241, 244, 633 F.Supp. 1364, 1369 (1986); *Timken Co. v. United States,* 10 CIT 86, 90, 630 F.Supp. 1327, 1332 (1986); *Gilmore Steel Corp. v. United States,* 7 CIT 219, 223–24, 585 F.Supp. 670, 674 (1984). A contrary holding is tantamount to saying that "once an error initially evades detection, the ITA is thereafter powerless to take remedial steps, thereby compounding the error." [11] *Gilmore Steel,* 7 CIT at 224, 585 F.Supp. at 674. Commerce, however, may not execute a subsequently adopted policy under the guise of correcting inadvertent errors or remedying unlawful dumping findings. *See American Trucking Ass'ns, Inc. v. Frisco Transp. Co.,* 358 U.S. 133, 146, 79 S.Ct. 170, 177–78, 3 L.Ed.2d 172 (1958). If allowed to continuously revise prior decisions on the basis of new policies, an agency could amend endlessly, negating the finality of its decisions. *Badger–Powhatan,* 10 CIT at 245, 633 F.Supp. at 1369. Therefore, the court must determine whether Commerce's recent decision corrects a legally improper post-finding methodology, or whether it is simply an implementation of a new Commerce policy.

---

10. It is axiomatic that Commerce cannot alter an original scope determination that either includes or excludes certain merchandise with clear language. *Alsthom Atlantique v. United States,* 787 F.2d 565, 571 (Fed.Cir.1986); *Fuji Elec. Co. v. United States,* 12 CIT 606, 611, 689 F.Supp. 1217, 1221 (1988). Here, plaintiff contends that the original finding clearly excluded plaintiff's stainless tool steel because Bethlehem Steel and Crucible Steel were excluded and omitted, respectively, from the domestic industry injury determination. Plaintiff argues that the absence of their two main competitors from the injury determination clearly indicates that the antidumping finding did not extend to their merchandise. If their merchandise was in fact covered, the two main competitors would have been included.

Plaintiff's argument is unpersuasive. It is not based on the clear language of the class or kind of merchandise description of the dumping finding and underlying petition, but rather rests upon an inference that must be made from the injury determination and evidence relating to competitors' production in later years. Necessity of the inference undermines plaintiff's reliance on *Fuji Elec. See Fuji Elec.,* 12 CIT at 611, 689 F.Supp. at 1219 (Treasury amended the antidumping proceeding notice to clarify the original finding to specifically include rectifier transformers as examples of the product under investiga-

tion; Commerce could not restrict scope thereafter).

11. Plaintiff reads *Ericsson GE Mobile Communications, Inc. v. United States* and *Badger–Powhatan* very narrowly, contending that they limit Commerce to reviewing its own determinations. Pl.Reply Br. at 14; *Ericsson GE Mobile Communications, Inc. v. United States,* 60 F.3d 778, 782 (Fed.Cir.1995); *Badger–Powhatan,* 10 CIT at 244, 633 F.Supp. at 1369. This view leads to a questionable result when Commerce is called upon to rectify an unlawful determination of its predecessor agency. As a practical matter, Commerce must be able to review incorrect antidumping decisions by Treasury. Otherwise the error cannot be cured, further compounding the problem. The reasoning of *Gilmore Steel,* 7 CIT at 223–24, 585 F.Supp. at 674, is as applicable to Commerce's review of Treasury's dumping decisions as it is to Commerce's review of its own. Moreover, in *Fuji Elec.,* the court stated that Commerce may clarify the scope of a prior dumping finding, but cannot change the scope of the determination. 12 CIT at 611, 689 F.Supp. at 1221. In *Fuji Elec.,* the case involved a Treasury determination, a subsequent clarification by Treasury and, as here, a subsequent reexamination of the determination by Commerce. *Id.* at 610–11, 689 F.Supp. at 1219.

## II. Assessment of Treasury's 1976 Scope Ruling.

Under the current law,[12] Commerce considers the descriptions of the merchandise contained in: (1) the petition, (2) the initial investigation, (3) the determinations of the ITA, and (4) the determinations of the ITC, to determine if the description itself is dispositive. 19 C.F.R. § 353.29(i)(1). Only if the description of the product is ambiguous will Commerce consider the four *Diversified Products* factors.[13] *Id.*

■ In the context of applying current law, Commerce concluded that Treasury's 1976 determination unlawfully narrowed the class or kind of merchandise in the original finding by adding two criteria: a requirement that a product must be included in the list of models or grades in the petition and a requirement that the product have the same end use as the models or grades listed in the petition. The court agrees that if Treasury imposed these tests as bright line additional criteria, then Treasury erred.[14] The petition listed the grades and uses of steel as "examples," implying the list was not intended as an exhaustive analysis of all stainless steel products.[15] In addition, the court in *Mitsubishi Elec.* explicitly stated that the petitioner "did not need to provide inclusive information covering all the categories and subcategories of all those goods included as like the class or kind of merchandise to be investigated." *Mitsubishi Elec.*, 700 F.Supp. at 559.

■ Nonetheless, Commerce erred when it went beyond these considerations and applied current standards. Treasury's post-finding ruling was a final determination. Changing the determination based on a new policy would negate such finality. *See Badger–Powhatan*, 10 CIT at 245, 633 F.Supp. at 1369. As indicated, as a matter of law Commerce cannot change a decision as a means to implement a new policy. *See American Trucking Ass'ns*, 358 U.S. at 146, 79 S.Ct. at 177–78. A finding of error under the current standards could be mere pretext for applying a new policy to a prior decision. In addition, it would be unfair to the participants to find that Treasury committed an error in the application of a policy not in existence at the time of the decision. Instead, the lawfulness of Treasury's post-finding ruling must be assessed under the law and attendant scope determination standards in effect in 1976.[16]

First, it appears that in 1976 Treasury applied the same factors in scope determination cases as applied in the classification case *United States v. Carborundum Co.*, 536 F.2d 373, 377 (C.C.P.A.1976).[17] In *Kyowa Gas Chemical Industry Co., Ltd. v. United States*, 7 CIT 138, 140, 582 F.Supp. 887, 889 (1984), *appeal after remand*, 7 CIT 311, 1984 WL 3729 (1984), when ordered in a § 751

---

**12.** Commerce currently makes scope determinations pursuant to 19 C.F.R. § 353.29(i).

**13.** The four factors are: (1) the physical characteristics of the product; (2) the expectations of the ultimate purchasers; (3) the ultimate use of the product; and (4) the channels of trade. 19 C.F.R. § 353.29(i)(2); *Diversified Prods.*, 6 CIT at 162, 572 F.Supp. at 889. *See also* 19 U.S.C. § 1677j (same factors utilized for analyzing later developed merchandise for anticircumvention purposes).

**14.** It is not clear to the court exactly how Treasury considered these factors.

**15.** In addition, classification of stainless steel by use is problematic. Kirk–Othmer 21 *Encyclopedia of Chemical Technology* 552 (3d Ed.1983) (noting that classification of steel by use contradicts the standard industry practice, whereas classification of steel by chemical composition is preferred).

**16.** Because of this holding there is no need to address arguments relating to Commerce's 1990 affirmation of the 1976 Treasury determination.

**17.** In *Carborundum*, the court found that it must consider all pertinent circumstances in classifying merchandise. *Carborundum*, 536 F.2d at 377; *Star–Kist Foods, Inc. v. United States*, 45 C.C.P.A. 16, 19, 1957 WL 8256 (1957). Specific, but not exclusive factors included: general physical characteristics of the merchandise, expectation of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed), the use if any in the same manner as merchandise which defines the class, the economic practicality of so using the import, and the recognition in the trade of this use. *Carborundum*, 536 F.2d at 377; *see also Maher–App & Co. v. United States*, 57 C.C.P.A. 31, 37, 418 F.2d 922 (1969) (Baldwin, J. concurring); *United States v. Baltimore & Ohio R.R. Co.*, 47 C.C.P.A. 1, 1959 WL 7622 (1959) (environment of the sale).

review to apply the applicable criteria used in antidumping scope determinations, Commerce applied the same criteria as set forth in *Carborundum*. In footnote 2 of *Kyowa Gas*, the court noted that even prior to 1984,

> [i]n determining whether the 1976 antidumping finding on Acrylic Sheet from Japan encompassed [a product] ... the Customs Service in *1978* considered these [*Carborundum* ] criteria 'essential factors' to be used as 'guidelines' in making rulings on specific products.

*Id.* (emphasis added). It is clear that by 1978, and by inference 1976, that Treasury utilized the same totality of the circumstances test in antidumping scope determinations as set forth in *Carborundum*.

Second, the court notes that the 1976 standards are not identical to the standards applied currently. Specifically, the current threshold test of finding ambiguity in the documentary description of the merchandise as set forth under 19 C.F.R. § 353.29(i)(1) before resorting to *Diversified Products* or *Carborundum* type factors is not applicable under the 1976 standards. Neither party cites any support for the proposition that Treasury applied the threshold test in 1976. Moreover, the court in *Kyowa Gas* implies that Treasury *did not* apply the threshold test. *See* 7 CIT at 140, 582 F.Supp. at 889. As late as 1984, the threshold test was considered a recent invention of Commerce, implying that neither Commerce or Treasury had applied this test previously in antidumping scope determinations. *Id.* Specifically, the court in *Kyowa Gas* stated:

[t]he Department qualifies the utilization of these [Diversified Products] criteria as a standard or test by conditioning their use upon a preliminary finding that the initial product description is "vague." Neither precedent nor authority has been submitted to substantiate the newly enunciated ITA standard.... The court is unable to accept this qualified application.

*Id.*

In addition, it would be impractical to apply today's threshold test based upon the evidence available in 1976. Under the current law, Commerce analyzes four documents in reaching its determination of whether the merchandise description is dispositive or ambiguous. 19 C.F.R. § 353.29(i)(1). In 1976, out of the four documents only the petition existed. Moreover, in 1976, Treasury did not publish an official definition of stainless steel plate as Commerce would do today; therefore any documents which might be analogous lacked an anchoring description. These facts suggest that Treasury would not have relied upon the petition definition as the dispositive factor in its antidumping scope determination, but instead it was merely one factor considered under the totality of the circumstances test.

■ Thus, the court remands this matter to Commerce. First, Commerce must apply the 1976 standards to determine whether Treasury erred in its post-finding ruling. In reviewing Treasury's actions Commerce must interpret ambiguous actions in accordance with the presumption of administrative legality and regularity.[18] More-

---

18. In 1976, 28 U.S.C. § 2635 stated that "[i]n any matter in the Customs Court, the decision of the Secretary of the Treasury, or his delegate, is presumed to be correct. The burden to prove otherwise shall rest upon the party challenging a decision." Thus, Treasury antidumping determinations, mainly appraisement and valuation decisions, were entitled to a presumption of legality and regularity. *See e.g., Maher–App & Co. v. United States,* 64 Cust.Ct. 598, 604 (1970) (the finding of foreign market value is presumed by statute (28 U.S.C. § 2633) to be correct; burden is on the plaintiff to establish by substantial evidence that foreign market values are erroneous.); *James C. Goff Co. v. United States,* 61 Cust.Ct. 506, 513 (1968).

The legislative history explaining the new provision 28 U.S.C. § 2639 further suggests that the presumption of legality and regularity applied in antidumping cases both before and after 1980. *See* H.R.Rep. No. 1235, 96th Cong., 2d Sess. 58, *reprinted in* 1980 U.S.C.C.A.N. 3729 at 3770 (28 U.S.C. § 2639(a)(1) applies the presumption of legality and regularity to judicial review in antidumping determinations under 28 U.S.C. § 1516a.). The House Report noted that § 2639 merely "restates the existing law" set forth in 28 U.S.C. § 2635. *Id.* Moreover, "the committee [did] not intend to impose a limitation on the presumption of regularity and legality which is normally accorded to actions of a Government agency or official." *Id.*

over, at this stage, Commerce may not re-weigh the evidence. If a court would find sufficient evidence to sustain Treasury's decision, so must Commerce.[19] Second, if Treasury erred, Commerce may correct the antidumping scope determination by applying the law in effect in 1976.

Remand results are due within 45 days hereof.

19. The court in *Alsthom Atlantique* imposed a similar standard of review upon ITA's § 751 review of a prior Treasury scope determination. *See Alsthom Atlantique*, 787 F.2d at 571. The court noted that otherwise,

> the ITA [would be led] into an impossible task of reviewing de novo each and every Treasury antidumping determination to determine whether Treasury correctly included the article in question within the scope of its underlying antidumping determination.... [T]he ITA does not have the power to substitute its judgment for Treasury's when Treasury has specifically included an item within its antidumping determination.

*Id.* Similarly, here, Commerce may not impose its own judgment for Treasury's in reviewing the 1976 determination for error and must affirm the determination if supported by substantial evidence on the agency record.