**BÖHLER–UDDEHOLM CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant,**

and

**Allegheny Ludlum Steel Corporation, Washington Steel Corporation, and G.O. Carlson, Inc., Defendant–Intervenors.**

Slip Op. 97-127
Court No. 95–08–01024.
United States Court of
International Trade.

Sept. 10, 1997.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Randi–Sue Rimerman), Carlos A. Garcia, Attorney–Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, Washington, DC, for defendant.

Collier, Shannon, Rill & Scott, PLLC, (Paul C. Rosenthal, John B. Brew and Jeffrey S. Beckington), Washington, DC, for defendant-intervenors.

## OPINION

RESTANI, Judge.

On November 14, 1996, this court remanded the Department of Commerce, International Trade Administration's two letter rulings in *Stainless Steel Plate from Sweden.*[1] *Böhler–Uddeholm Corp. v. United States*, 946 F.Supp. 1003, 1004 (Ct. Int'l Trade 1996). The letter rulings reversed the Treasury Department's 1976 post-finding scope ruling and held that two grades of stainless steel plate sold by plaintiff Böhler–Uddeholm Corporation under the trade names UHB Stavax ("Stavax") and UHB Ramax ("Ramax") were within the scope of the 1973 antidumping finding issued in *Stainless Steel Plate from Sweden*, 38 Fed.Reg. 15,079, 15,079 (Treasury Dep't 1973).

The court noted in its decision ordering remand that while Commerce may amend a determination when it has " 'utilized a legally improper method in making a determination or when the original determination contains an error of inadvertence or mistake,' " Commerce could not determine that Treasury erred in its 1976 post-finding ruling or correct that error by applying the current standard used in scope determinations.[2] *Böhler-*

---

1. The two letter rulings were *Stainless Steel Plate from Sweden,* (Dep't Commerce 1995) (final scope ruling and mem., flat rolled products) (Def.-Intervenor's App., Tab 1) and *Stainless Steel Plate from Sweden,* (Dep't Commerce 1995) (final scope ruling and mem., forged products)

(Pl.'s App., Tab 2) (hereinafter *"November 1995 Determination"*).

2. Under the current scope determination standard, Commerce must first determine if the description of the merchandise is itself dispositive. 19 C.F.R. § 353.29(i)(1). Only if the description

*Uddeholm Corp.,* 946 F.Supp. at 1007, 1009–10. Rather, the court held that Commerce must apply the scope determination standard in effect in 1976,[3] which was the totality of the circumstances test applied in the classification case· *United States v. Carborundum Company,* 63 C.C.P.A. 98, 536 F.2d 373, 377 (1976). *Id.* at 1008.[4] Moreover, "the current threshold test of finding ambiguity in the documentary description of the merchandise as set forth under 19 C.F.R. § 353.29(i)(1) before resorting to *Diversified Products* or *Carborundum* type factors is not applicable under the 1976 standards." *Id.* at 1009.

On remand, the court instructed Commerce to:

apply the 1976 standards to determine whether Treasury erred in its post-finding ruling. In reviewing Treasury's actions Commerce must interpret ambiguous actions in accordance with the presumption of administrative legality and regularity. Moreover, at this stage, Commerce may not reweigh the evidence. If a court would find sufficient evidence to sustain Treasury's decision, so must Commerce. Second, if Treasury erred, Commerce may correct the antidumping scope determination by applying the law in effect in 1976.

*Id.* at 1009–10. In its remand determination, Commerce concluded that Treasury erred in

its 1976 post-finding ruling. *Final Results of Redetermination Pursuant to Court Remand, Böhler–Uddeholm Corp. v. United States,* Slip Op. 96-184 (Nov. 14, 1996) at 3 (hereinafter *"Remand Results"*). In addition, Commerce determined that Treasury applied the standard articulated in *Acrylic Sheet from Japan* [5] and not the *Carborundum* standard in making scope determinations. *Id.* at 5. Applying the *Acrylic Sheet* standard, Commerce found that Stavax and Ramax, whether flat-rolled or forged, are within the scope of the 1973 antidumping finding on stainless steel plate from Sweden. *Id.* at 2–3. This matter is now before the court following Commerce's remand determination.

## Discussion

### I. Remand Determination that Treasury Erred in its 1976 PostFinding Ruling

Commerce's remand determination concluded that Treasury's post-finding ruling was unlawful on a number of bases.

First, the Department has determined that, at least with respect to flat-rolled Stavax and Ramax, Treasury could have reached a determination by applying a plain reading of the scope language under the finding on stainless steel plate from Sweden. Second, the Department has determined that if Treasury could not resolve, with a plain reading, whether flat-

of the product is ambiguous will Commerce consider the four *Diversified Products* factors codified in 19 C.F.R. § 353.29(i)(2). The four *Diversified Products* factors are: (1) the physical characteristics of the product; (2) the expectations of the ultimate purchasers; (3) the ultimate use of the product; and (4) the channels of trade. 19 C.F.R. § 353.29(i)(2); *Diversified Prods. Corp. v. United States,* 6 CIT 155, 162, 572 F.Supp. 883, 889 (1983).

**3.** The court has assumed and no one has argued that the law as to scope determinations changed between the time of the original investigation in 1973 and the time of the scope determination in 1976.

**4.** The seven factors considered in the totality of the circumstances test include

the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, the environment of the sale (i.e., accompanying accesso-

ries and the manner in which the merchandise is advertised and displayed), the use, if any, in the same manner as merchandise which defines the class, the economic practicality of so using the import, and the recognition in the trade of this use.

*Carborundum Co.,* 536 F.2d at 377 (citations omitted).

**5.** The *Acrylic Sheet* standard is articulated in an unpublished letter response to an inquiry regarding the status of certain products under *Finding of Dumping of Acrylic Sheet from Japan,* 41 Fed. Reg. 36,497 (Treasury Dep't 1976). *See Acrylic Sheet from Japan,* (Treasury Dep't 1978) (letter ruling); Def.'s App., at 46–47 (hereinafter *"Acrylic Sheet"*). It is a restricted version of the *Carborundum* standard as it is limited to five of the *Carborundum* factors: (1) physical characteristics of the merchandise, (2) uses for which the merchandise is imported and the economic practicality of so using the import, (3) the expectation of the ultimate purchasers, and (4) the channels of trade in which the merchandise moves. Factor (2) includes two *Carborundum* factors.

rolled or forged Stavax and Ramax were within the scope of the finding, the appropriate test which Treasury should have applied is the test set forth in its unpublished scope determination on the 1976 finding of dumping of Acrylic Sheet from Japan. The Department has also determined that, in reaching its 1976 scope ruling, Treasury used an impermissible bright line test and also failed to correctly apply the factors in that test. Our analyses reveal that, regardless of whether its bright line test was permissible, Treasury unlawfully altered the scope of the finding. In addition, the Department has determined that if Treasury had applied a plain reading of the scope language or used the *Acrylic Sheet* test, its determination that Stavax and Ramax fall outside the scope of the finding on stainless steel plate would not have been supported by substantial evidence on the record. Finally, our analyses have revealed that, however one characterizes the analysis employed by Treasury in its 1976 determination, the test applied in that ruling was neither an appropriate application of a plain reading of the description, the *Acrylic Sheet* analysis, the *Diversified* analysis, nor even the *Carborundum* analysis. Therefore, it was plainly incorrect.

*Remand Results,* at 8. Moreover, Commerce found that the 1976 ruling itself indicates that Treasury:

(1) did not include a complete reference to the scope of the antidumping finding; (2) ignored the fact that Stavax and Ramax clearly fall within the physical characteristics contained in the description of stainless steel plate in the petition . . ., failing to even mention this important fact; (3) relied heavily on the fact that the petition failed to include a price comparison of the

specific grades of steel in question; (4) emphasized its conclusion that the uses for which the merchandise was imported did not fall within the illustrative (not exhaustive) list contained in the petition and; (5) erroneously determined that Stavax and Ramax were not covered by the finding simply because such products were not part of the fair value price-to-price comparisons.

*Id.* at 9–10 (internal citation omitted). The court need not discuss all of the reasons relied upon by Commerce to sustain this section of the remand results as even one finding of error supported by substantial evidence would make Treasury's ruling unlawful.

▮▮▮▮ In its remand determination, Commerce concluded that under either the *Acrylic Sheet* test or the *Carborundum* test, Treasury's ruling was unlawful because Treasury did not consider all of the required factors. *See id.* at 8, 16. In reaching this determination, Commerce relied solely on the language of the 1976 ruling. *See id.* at 16. The post-finding ruling is implicitly divided into three sections. *See* Treasury's Mem. on Stainless Steel Plate from Sweden (Oct. 29, 1976); Pl.'s App., Tab 5, at 66–67 (hereinafter "Post-Finding Ruling Letter"). The first section details the materials appended to Böhler–Uddeholm's memoranda. *Id.* at 66. Here, Böhler–Uddeholm described Stavax and Ramax as tool steel with a specific chemical composition. *Id.* The second section contains Treasury's description of stainless steel plate, defined by physical dimension and ability to resist corrosion and abrasion.[6] *Id.* The third section contains Treasury's analysis and conclusion. *Id.* at 66–67. In this section, Treasury stated:

found that Treasury's definition of the scope was incomplete as it failed to mention the chemical composition of stainless steel plate, a factor that was expressly mentioned in the 1972 petition and relied upon by the Tariff Commission in its injury determination. Treasury's recitation in the Post–Finding Letter Ruling of Böhler–Uddeholm's own characterization of its products which included a reference to chemical composition does not by itself support a contrary finding.

---

6. In this section of the Post–Finding Letter Ruling, Treasury defined its interpretation of the scope of the 1973 antidumping finding as follows:

Stainless steel plate, the merchandise that is subject to the finding of dumping (T.D. 73–157), are flat[-] rolled or forged steel plates over 10 inches in width and 3/16 inch or more in thickness, renowned for their resistance to corrosion and abrasion.

Post–Finding Letter Ruling, Pl.'s App., Tab 5, at 66. In its remand results, Commerce correctly

[N]one of the aforementioned grades of steel were enumerated in. the complainant's price. comparison. Inasmuch as the complaint failed to address itself to those varieties of steel, and based on the materials appended to your memorandum, it is our opinion that UHB 904L plate, UHB Stavax and UHB Ramax, manufactured by [Böhler-]Uddeholm Steel Company, Sweden, do not come within the purview of T.D. 73–157. We note that UHB 904L plate does not fall within the stainless steel family given the industry standards. We also note that UHB Ramax and UHB Stavax are stainless plastic mold steels rather than stainless steel plate. In addition, Customs did not consider these varieties of steel during the course of the fair value investigation.

*Id.*

Commerce's conclusion in this regard is supported by substantial evidence and thus is affirmed. Treasury's 1976 post-finding ruling mentioned facts relevant to a proper scope determination, but did not integrate these facts into its analysis section. The analysis section does not address the factors of either *Acrylic Sheet* or *Carborundum* such as physical characteristics, expectations of purchasers, or channels of trade of stainless steel plate. *See* Post–Finding Ruling Letter; Pl.'s App., Tab 5, at 66–67. Instead, "every sentence in the paragraph relates to Treasury's analysis of the use requirement it added or the requirement added by Treasury that Stavax or Ramax fall under one of the listed grades." *Remand Results*, at 16; *see also* PostFinding Ruling Letter; Pl.'s App., Tab 5, at 66–67. Plaintiff counters Commerce's findings by suggesting that Commerce cannot determine twenty years later

the degree of weight given to each factor and speculates that those factors not explicitly mentioned may have been implicitly considered by Treasury. As plaintiff has not directed the court to any record evidence to support its argument or to contradict Commerce's finding, this argument is unpersuasive.

Moreover, Commerce further supported its remand determination that Treasury did not consider all of the relevant factors by concluding that Treasury's post-finding scope ruling was based, in significant part, on the fact that Stavax and Ramax were not listed in the petition as examples of price comparisons for stainless steel plate and that this reliance constituted an impermissible "bright line test."[7] *Remand results,* at 15–16 (quoting *Böhler–Uddeholm Corp.,* 946 F.Supp. at 1008).

■ The court agrees with Böhler–Uddeholm that the evidence does not indicate the relative weight Treasury assigned to this factor and thus does not indicate its use as a "bright line test." The court, however, sustains this aspect of the remand results as the finding that Treasury based its ruling, at least in part, on the omission of Stavax and Ramax's grades of steel from the petition's list of price comparisons is supported by substantial evidence. In fact, Treasury's ruling included only one expressly articulated reason for excluding Stavax and Ramax— that the grades of steel in question were not enumerated in the petition. *See* Post–Finding Ruling Letter; Pl.'s App., Tab 5, at 66–67. Treasury's consideration of the list as complete in determining the scope of the class or kind of merchandise was thus unlawful.[8]

---

7. The court stated in the remand opinion that there is no requirement that the petition provide a complete description or list of models, grades or uses of the merchandise subject to the antidumping allegation. *See Böhler–Uddeholm Corp.,* 946 F.Supp. at 1008. Thus, the court stated that if Treasury considered the illustrative product examples of the subject merchandise in the petition to provide a bright line test,· then Treasury erred. *Id.*

8. In addition to contesting the individual findings of error, plaintiff argues that Commerce ignored the court's remand instructions by applying the *Diversified Products* threshold test specifically rejected by the court in its remand opinion. The court agrees with plaintiff that Commerce's finding of error by applying a "plain reading" of the scope language is merely an application of the threshold test under a different name. *See Böhler–Uddeholm Corp.,* 946 F.Supp. at 1009. As this contradicts the court's ruling, we do not rely on this finding to sustain this aspect of the remand results.

Moreover, plaintiff argues that·Commerce applied the *Acrylic Sheet* factors instead of the *Carborundum* factors. The distinction between the *Acrylic Sheet* test and that of *Carborundum* is

■ In addition to contesting each finding of error, plaintiff also argues that Commerce disregarded the court's instructions to

> interpret ambiguous actions in accordance with the presumption of administrative legality and regularity. Moreover, at this stage, Commerce may not reweigh the evidence. If a court would find sufficient evidence to sustain Treasury's decision, so must Commerce.

*Böhler–Uddeholm Corp.*, 946 F.Supp. at 1009–10. The court notes the significance of these instructions because not just legally, but practically, a decision three years after the original determination should be presumed correct. More than twenty years after the fact, Commerce should find error reluctantly.[9] In its remand determination, however, Commerce stated that while it disagrees with the court's instruction to apply the presumption, it

> [n]onetheless, in accordance with the Court's statement ... we have examined the record to determine whether Treasury's 1976 determination was supported by substantial evidence on the record at that time, rather than impose our own

judgement or examine Treasury's ruling under standards currently in effect which were not in effect in 1976.

*Remand Results*, at 2. In addition, plaintiff has not directed the court's attention to any evidence indicating that Commerce did not interpret Treasury's actions in accordance with the presumption of administrative regularity. Rather, plaintiff argues merely that if the presumption had been applied the result would have been different. This is not a sufficient basis to reject Commerce's remand determination.

## II. Commerce's Application of the 1976 Scope Determination Standard

■ The court's remand opinion stated that if Treasury erred, Commerce may correct the antidumping scope determination by applying the law in effect in 1976. *Böhler–Uddeholm Corp.*, 946 F.Supp. at 1010. The court further instructed Commerce that in 1976, Treasury applied a totality of the circumstances test which included, but was not limited, to the seven factors listed in *Carborundum* when making scope determinations.[10] *Id.* at 1008. On remand, Commerce

---

irrelevant to this section of the remand determination. Commerce explicitly stated that "however one characterizes the analysis employed by Treasury in its 1976 determination, the test applied in that ruling was neither an appropriate application of a plain reading of the description, the *Acrylic Sheet* analysis, the *Diversified* analysis, nor even the *Carborundum* analysis." *Remand Results*, at 8. Plaintiff has not presented any evidence that the findings of error relied upon to sustain this aspect of the remand determination would be invalid under an application of the 1976 standards as articulated by the court.

9. This is not the first instance where the court has instructed Commerce not to substitute its own judgment for that of Treasury. In *Alsthom Atlantique v. United States*, 787 F.2d 565, 571 (Fed.Cir.1986) the court provided similar instruction to Commerce in section 751 reviews. There, Alsthom Atlantique argued that in order for Commerce to perform the review, it must first determine that there was an existing dumping finding that included the product in question and to reach that determination by reviewing every fact on the record *de novo*. The court rejected this argument by stating

> [w]hile it is true that the ITA must determine whether there was an existing dumping finding that included the item, once the ITA determines that the Treasury included the item un-

der its original antidumping determination, the ITA's inquiry into that issue ceases. Alsthom's assertion, if accepted, would lead the ITA into an impossible task of reviewing *de novo* each and every Treasury antidumping determination to determine whether Treasury correctly included the article in question within the scope of its underlying antidumping determination. In a section 751 review, the ITA does not have the power to substitute its judgment for Treasury's when Treasury has specifically included an item within its antidumping determination.

*Id.* The same practical and legal reasons driving the court's decision in *Alsthom Atlantique* apply to Commerce's review of a Treasury scope determination made 20 years ago. To substitute its own judgment for that of Treasury would lead Commerce into an impossible and unwise task of reviewing *de novo* agency decisions that were presumed to be in accordance with law and supported by substantial evidence when completed twenty years ago.

10. The court noted in *Böhler–Uddeholm* that Treasury considered the following seven specific, but not exclusive, factors in its scope determinations:

> ■ general physical characteristics of the merchandise, [2] expectation of the ultimate purchasers, [3] the channels, class or kind of trade in which the merchandise moves, [4] environ-

determined that Treasury did not apply the test articulated by the court, but instead applied the standard articulated in *Acrylic Sheet.* *Remand Results,* at 4. Applying the *Acrylic Sheet* standard, Commerce determined that Stavax and Ramax, both forged and flat-rolled, are within the scope of the antidumping finding on stainless steel plate from Sweden. *Id.* at 19. Plaintiff argues that Commerce's remand results are not in accordance with law and are unsupported by substantial evidence because: (1) Commerce applied the *Acrylic Sheet* factors instead of the *Carborundum* factors as directed by the court; (2) Commerce's *Acrylic Sheet* analysis relied on its November 2, 1995 *Diversified Products* analysis; and (3) the remand results are not supported by substantial evidence. For the reasons that follow, we remand this issue to Commerce.

First, Commerce did not apply the scope determination standard articulated by the court in its remand opinion. The court clearly stated in *Böhler–Uddeholm,* that in 1976 Treasury applied the totality of the circumstances test articulated in *Carborundum* when making scope determinations. 946 F.Supp. at 1008. In the remand results, however, Commerce determined that in 1976, Treasury applied the four factor standard articulated in *Acrylic Sheet* which included only five of the seven *Carborundum* factors: "1) [t]he physical characteristics of the merchandise; 2) [t]he uses for which the merchandise is imported and the economic practicality of so using the import; 3) [t]he expectation of the ultimate purchasers; and 4) [t]he channels of trade in which the mer-

chandise moves." *Remand Results,* at 5. Moreover, Commerce explicitly noted that "Treasury clearly did not purport to consider either the environment of the sale or the recognition in the trade of the use for the merchandise in its analysis in *Acrylic Sheet,*" both factors included in the *Carborundum* test. *Id.*

The determination in *Acrylic Sheet* does not conclusively establish that the restricted approach of *Acrylic Sheet* was applied in all scope determinations in 1976. In fact, the court is not aware of another Treasury decision applying that standard. Instead, the evidence suggests that Treasury could consider additional *Carborundum* factors as appropriate in each case. The language of the *Acrylic Sheet* determination itself describes the four factors as "essential factors" to be used as "guidelines", but does not explicitly limit Treasury to considering only these factors. *See Acrylic Sheet;* Def.'s App. at 46–47. Moreover, in *Kyowa Gas Chemical Industry Co. v. United States,* 7 CIT 138, 140, 582 F.Supp. 887, 889 (1984), the court considered the *Acrylic Sheet* finding and noted that the factors listed in the determination are "[a]mong the factors considered" by the agency making the scope determination. *Id.* (emphasis added)(citing *Parts for Self–Propelled Bituminous Paving Equipment from Canada,* 46 Fed.Reg. 47,806, 47,807 (Dep't Commerce 1981)(clarification of scope)(applying same factors in 1981 scope determination)).[11] Thus, in 1976 Treasury looked at as many of the *Carborundum* factors as were appropriate to a particular case. By re-

---

ment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed), [5] the use if any in the same manner as merchandise which defines the class, [6] the economic practicality of so using the import, and [7] the recognition in the trade of this use.

*Böhler–Uddeholm Corp.,* 946 F.Supp. at 1008 n. 17 (citing *Carborundum Co.,* 536 F.2d at 377).

11. The court in *Kyowa Gas* stated that

[a]mong the factors considered by the ITA are the general physical characteristics of the product; the expectations of the ultimate purchaser; the channels of trade in which the product is sold; the manner in which the product is advertised and displayed; and the ultimate use of the product:

*Id.* (citing *Parts for Self–Propelled Bituminous Paving Equipment from Canada,* 46 Fed.Reg. at 47,807). In a footnote immediately following this statement, the court noted that "[i]n determining whether the 1976 antidumping finding on Acrylic Sheet from Japan encompassed [the product in question], the Customs Service in 1978 considered *these* criteria 'essential factors' to be used as 'guidelines' in making rulings on specific products." *Id.* at n. 2 (emphasis added).

The criteria listed in *Kyowa Gas* include an additional factor, the manner in which the product is advertised, that is not present in the *Acrylic Sheet* determination itself. Combining the factors listed in the *Acrylic Sheet* determination with those listed in *Kyowa Gas,* only one *Carborundum* factor is implicitly excluded, the recognition in the trade of the product's use.

stricting its analysis to only the four factors listed in *Acrylic Sheet*, and not considering whether the additional factors listed in *Carborundum* were appropriate in this case, Commerce did not comply with the court's remand instructions.[12]

Moreover, the court must reject the remand results because they relied on the *Diversified Products* analysis of forged Stavax and Ramax conducted by Commerce in November 1995. On remand, Commerce explained its methodology for correcting the scope determination by stating that

> [it] ha[s] re-examined the scope issue under the *Acrylic Sheet* standard. We note that this standard is very similar to the *Diversified Products* standard codified at 19 C.F.R. Sec. 353.29(i)[ (2) ], which we applied in our November 2, 1995 determination that Stavax and Ramax, when forged, are properly included within the scope of the finding. Because the *Diversified* and *Acrylic Sheet* analyses are so similar and we have already analyzed Stavax and Ramax under [*Diversified Products* ], it is appropriate, for these [ ] remand results, to provide a brief explanation of our *Acrylic Sheet* analysis herein.[13]

*Remand Results,* at 16–17. While Commerce explicitly relied in part on its 1995 determination for only two *Acrylic Sheet* fac-

tors, use and expectations of the purchasers, it is unclear if it conducted a new analysis or merely reworded the *Diversified Products* analysis for the other factors. *See id.* at 17–18.

The extent of Commerce's reliance on the 1995 determination, however, need not be decided as any reliance would be unlawful. A proper *Diversified Products* analysis would compare the product in question to the entire class or kind of merchandise subject to the antidumping finding. Here, Commerce primarily relied on a comparison of forged Stavax and Ramax to flat-rolled Stavax and Ramax, instead of to the class or kind of merchandise, stainless steel plate. Passages from Commerce's *November 1995 Determination* for each *Diversified Product* factor demonstrate the unlawful comparison. *See November 1995 Determination;* Pl.'s App., Tab 2, at 32–41. In its analysis of use, for example, Commerce stated:

> Based on an analysis of the ultimate use of Stavax and Ramax, the Department concludes that Stavax and Ramax, when forged, have the same ultimate use as merchandise within the scope of the antidumping finding on stainless steel plate from Sweden, *such as flat[-] rolled Stavax and Ramax.*

*November 1995 Determination;* Pl.'s App., Tab 2, at 39 (emphasis added).[14]

**12.** Commerce's statement in the remand results that they would reach the same conclusion under any of the tests, including *Carborundum, Acrylic Sheet,* or *Diversified Products* does not apply to this determination. *Remand Results,* at 8. Commerce made this statement in the context of finding an error in Treasury's 1976 ruling. It was not made to justify Commerce's subsequent application of *Acrylic Sheet* instead of *Carborundum* to correct the original error. *See id.*

**13.** The remand results state that Commerce previously analyzed Stavax and Ramax under *Acrylic Sheet. Remand Results,* at 17. The court assumes that Commerce intended to state that its previous analysis was under *Diversified Products.*

**14.** The responses of defendant and defendant-intervenors do not address the narrow argument raised by plaintiff. Commerce in its remand results responds to Böhler–Uddeholm's argument by noting that the November 1995 *Diversified Products* analysis addressed each of the four *Diversified Products* factors. *See Remand Results,* at 23–24. Moreover, Commerce stated

that although the *Diversified Products* analysis was undertaken after determining that flat-rolled Stavax and Ramax were within the scope of the finding, that "[n]evertheless, our *Diversified Products* analyses involved a comprehensive examination of forged Stavax and Ramax which included our examination of more than simply the 'forged' characteristics of the product." *Id.* at 24. This response does not address whether Commerce compared forged Stavax and Ramax only to flat-rolled Stavax and Ramax.

Defendant-intervenors note that in the remand results Commerce did not rely solely on the November 1995 *Diversified Products* analysis. Instead, Commerce explicitly relied on the November analysis only for two of the factors, use and expectations of the purchaser. Moreover, for those two factors, Commerce provided additional evidence to support its conclusions beyond the evidence supporting the *November 1995 Determination.* This too clearly does not address the threshold issue of whether Commerce simply compared forged to flat-rolled Stavax and Ramax. The court does not reach the issue of

Moreover, Commerce's articulated reasoning for including Stavax and Ramax under the *Diversified Products* test further supports the conclusion that Commerce primarily compared forged Stavax and Ramax to flat-rolled Stavax and Ramax. First, Commerce implicitly relied on its original determination that flat-rolled Stavax and Ramax were within the scope of the antidumping finding under the threshold dispositiveness test of 19 C.F.R. § 353.29(i)(1). *See November 1995 Determination;* Pl.'s App., Tab 2, at 30. Second, Commerce found that for many factors of the *Diversified Products* test, Böhler–Uddeholm could not distinguish between flat-rolled and forged Stavax and Ramax. *See generally, id.* at 33–41. Thus, as flat-rolled Stavax and Ramax were already within the scope of the antidumping finding and forged Stavax and Ramax were not distinguishable, Commerce concluded forged Stavax and Ramax must also be within the class or kind of merchandise.[15] *See id.* Commerce's reasoning suggests a comparison only to flat-rolled Stavax and Ramax and not to stainless steel plate.

Even if Commerce did not limit its comparison of forged Stavax and Ramax solely to flat-rolled Stavax and Ramax, its reasoning in the *November 1995 Determination* is flawed under the 1976 standards. Under the 1976 standards, Treasury did not apply the current threshold dispositiveness test codified at 19 C.F.R. § 353.29(i). *Böhler–Uddeholm Corp.,* 946 F.Supp. at 1009. Thus, Commerce's reliance on the inclusion of flat-rolled Stavax and Ramax under the threshold test as a means of concluding that forged Stavax and Ramax are also included, is not valid under the 1976 standards.

In addition, the *November 1995 Determination* relied on evidence not on the agency record in 1976. As this case concerns an error correction as to a twenty-year old scope ruling, permitting a new scope ruling based on new evidence and new policies would allow a fundamental change in the original definition of the class or kind of merchandise.[16] This is not permitted. In its *November 1995 Determination,* Commerce relied on new evidence in its analysis of the expectations of purchasers by referring to evidence discussed in the physical characteristics factor. *November 1995 Determination;* Pl.'s App., Tab 2, at 38. As support for its findings on the physical characteristics of Stavax and Ramax, Commerce relied in part on letters from the domestic industry written in 1994 and 1995, affidavits from 1995, and technical sources from 1985 and 1990. *Id.* at 34–37. Commerce was instructed to apply the 1976 standards using the evidence before Treasury in 1976; it was not instructed simply to provide the same analysis the court

whether the *Acrylic Sheet* analysis is supported by substantial evidence even without relying on the *1995 November Determination.*

**15.** The above summary of Commerce's reasoning is specifically articulated in the analysis of three of the four *Diversified Products* factors. In its analysis of the expectations of purchasers factor Commerce stated

First, the Department notes, as does the domestic industry in its rebuttal comments, that [Böhler-] Uddeholm fails to differentiate between forged and flat[-]rolled Stavax and Ramax in discussing the expectations of the purchasers.... Moreover, [Böhler-]Uddeholm's product brochures for Stavax and Ramax do not differentiate between forging or flat rolling. [Böhler-]Uddeholm has submitted nothing that demonstrates that a purchaser of forged Stavax and Ramax has expectations that differ from those of a purchaser of flat[-]rolled Stavax and Ramax, or other stainless steel plate within the scope of the finding.

Based on an analysis of the expectations of purchasers of Stavax and Ramax, the Department concludes that forging versus flat[-]rolling does not alter the purchaser expectations for Stavax and Ramax. The purchaser expectations for Stavax and Ramax, when forged, are the same as for merchandise within the scope of the antidumping finding on stainless steel plate from Sweden, such as flat[-]rolled Stavax and Ramax.

*Id.* at 38. *See also id.* at 39 ("[Böhler-]Uddeholm fails to differentiate between forged and flat[-]rolled Stavax and Ramax in discussing the ultimate use of the product."); *Id.* at 40 ("[Böhler-]Uddeholm fails to differentiate between forged and flat-rolled Stavax and Ramax in discussing the channels of trade. The domestic industry argues that this is because Stavax and Ramax, whether forged or flat-rolled, are sold through the same channels of trade.").

**16.** Commerce may consider post–1976 evidence only for the purpose of ascertaining what facts were known up to the time of the 1976 decision.

previously rejected.[17]

Thus, the court remands this case to Commerce to apply the totality of the circumstances test as articulated in *Carborundum* by considering as many of the seven factors as are appropriate. Commerce is limited to the record before Treasury in 1976. Moreover, Commerce may not rely on (1) its prior determination that flat-rolled Stavax and Ramax are within the scope of the antidumping finding based on the *Diversified Products* threshold test, (2) the November 1995 *Diversified Products* analysis for forged Stavax and Ramax, or (3) the *Acrylic Sheet* analysis provided in the first remand results.

Remand results are due within 30 days. Any objections shall be filed 11 days thereafter. Response, if any, is due within 5 days thereafter.

---

**17.** As Commerce applied the wrong standard while correcting Treasury's error, the court does not reach the issue of whether under that incorrect standard Commerce's findings were supported by substantial evidence.